## OSMUND STRAND v. VILLAGE OF WATSON.[1]

October 28, 1955.

Nos. 36,496, 36,502.

[1]Reported in 72 N. W. (2d) 609.

Saltness & Cudd and John C. Haave, for defendant-appellant.

James R. Bennett and Miles W. Lord, for plaintiff-appellant.

Byron W. McCullagh, for Minnesota Municipal Liquor Stores Assn., Inc., amicus curiae.

KNUTSON, JUSTICE.

This case arises out of a collision between an automobile driven by plaintiff and one driven by one Raymond H. Martinson. The proven facts are not seriously in dispute. The inferences which properly can be drawn from the proven facts and circumstances surrounding the activities of Martinson give rise to the main differences of opinion between the parties. From the record it reasonably may be said that the following facts could be found by the jury.

The city of Montevideo, in Chippewa County, maintains a municipal liquor store, as does defendant, Village of Watson, which lies about six miles northwest of Montevideo, in the same county. Raymond H. Martinson was an itinerant salesman of office supplies, shoes, and similar lines and lived in La qui Parle, which has been referred to as a village and is about seven miles west of Watson. Trunk Highways Nos. 7 and 59 concur in connecting Montevideo and Watson.

On September 22, 1953, Martinson was in Montevideo and in the afternoon visited the Montevideo liquor store where he consumed two or three 12-ounce bottles of beer while discussing business with one Jack Emmons, who has since died. He was in this liquor store for about 20 to 30 minutes. Later in the afternoon he drove to Watson, arriving there around five o'clock or later. He made calls at the Iverson garage and at a newspaper office. He was in defendant's liquor store before or between those calls, but he testified that

he does not remember whether he had a drink. Later he returned to the liquor store and remained there until about 7:45 p. m. The evidence shows that during that time he consumed three or four bottles of beer. The bartender, Dean R. Torgerson, testified that he served Martinson two bottles, and Aane S. Torgerson, the store manager, testified that he served him one. The only other employee, Lowell K. Johnson, did not serve him any liquor. No liquor was sold to Martinson off-sale. He consumed the three bottles of beer while sitting in a booth in the company of Olaf L. Peterson and Carl Severhus, who were neighbors from Lac qui Parle village and were more or less casual acquaintances.

All the parties who saw Martinson in the liquor store testified that he did not show any of the usual characteristics of an intoxicated person—his responses were excellent; his speech was not slurred or sloppy; he was perfectly clear; he did not become loud or boisterous; and he showed no results of the drinks. The only evidence which might be said to be to the contrary was that of Olaf L. Peterson, and he testified as follows:

"Q. From your observations of Ray Martinson on September 22nd, 1953, while you were with him or saw him in the liquor store at Watson on that day, I'll ask you whether you have an opinion as to whether or not he was intoxicated?

"A. Well, I could tell on him that he had been drinking, but as far as being drunk, that I wouldn't say he was.

"Q. You wouldn't say that he was?

"A. No.

"Q. Would you say that he wasn't?

"A. I could tell he had been drinking, but I don't know how much or anything."

On cross-examination Peterson testified as follows:

"Q. Now, let's see, Mr. Martinson had been in there sometime before you got there, and you say you could tell he had had a few drinks?

"A. Yes, you know, by just looking at him; and he sat there with a bottle."

Martinson left the liquor store between 7:30 and 8 p. m. He testified that he went to his automobile, a 1939 Ford coupe, and looked over a sales order and checked his sales material. He then testified that he had a pint of brandy in his car which he had purchased some weeks previous and from which he had, previous to that date, taken two or three drinks. He consumed the rest of the pint of brandy and discarded the bottle.

About 45 minutes after leaving the liquor store and after drinking the brandy, Martinson started to drive to Montevideo to go to the Milwaukee depot. En route he had trouble with his headlight dimmer switch on the floor of his car and attempted to rectify the trouble while driving, kicking at the switch and reaching down to release it by hand. While he was thus engaged and at a point a mile or so northwest of Montevideo on Trunk Highway No. 7, his car collided head-on with plaintiff's 1946 Chrysler automobile, occupied only by plaintiff, demolishing both cars. Both plaintiff and Martinson were rendered unconscious in the collision. The collision occurred and the cars came to rest in plaintiff's traffic lane. This collision occurred at or about 8:50 p. m. The distance traveled by plaintiff was four and one-half to five miles.

Martinson was placed in an ambulance while unconscious. He revived and wandered short distances from the ambulance while plaintiff was being examined and placed therein. The ambulance driver, Arnold C. Anderson, placed him on the front seat of the ambulance for the trip to the hospital. On the way to the hospital, Martinson opened the car door and attempted to leave the ambulance. Anderson kept him in the seat by holding his belt until he arrived at the hospital.

Martinson had sustained severe cuts on both knees and blows and cuts on his forehead and lips. When he walked away from the ambulance at the scene of the collision, his gait was unsteady; he had been conscious a few minutes; his speech was slurred; and his breath carried the odor of alcohol. Anderson did not express an opinion that Martinson was intoxicated but stated:

"I would have to qualify my answer in this case. In case the man has been drinking and involved in an accident, he undoubtedly or obviously will be under some state of shock in addition to his consumption of liquor, and I would not be qualified to say he was drunk. Obviously, he had taken intoxicating spirits, and he had been involved in an accident, both, which, of course, would affect his actions."

When they arrived at the hospital Anderson left Martinson in the ambulance while he went to get a wheel chair for him. When he returned to the ambulance Martinson was gone. Anderson took plaintiff into the hospital and then drove downtown to alert the police to look for Martinson. He then drove out to the scene of the collision and reported to highway patrolman, A. J. Keilen, that Martinson had disappeared.

About 10 p. m. Keilen left the scene of the collision and went downtown in search of Martinson. He found him sometime after 10 p. m. and took him to the hospital. While there he obtained a specimen of urine for urinalysis about 11 p. m. Keilen stated that, at the time he had Martinson in his car, he thought he was under the influence and that that is what prompted him to take the urine for analysis.

Dr. M. A. Burns, who treated Martinson's wounds at the hospital, testified that he was intoxicated. The nurse who was in attendance also said that he was intoxicated.

The sample of urine was sent to one Goodwin Joss of Minneapolis. Upon analysis, it showed a concentration of 0.27 percent by weight of alcohol. Joss testified that a person having 0.20 percent of alcohol in his urine would lose the clearness of intellect in driving possessed by an ordinary normal person. He testified that it would take at least 15 bottles of strong beer, consumed within a reasonable period of time, to obtain the percentage of alcohol found in Martinson's urine.

The jury returned a verdict of $3,000 for plaintiff. Thereafter, plaintiff made a motion for a new trial on the issue of damages only on the ground that the damages were inadequate. Defendant moved for judgment notwithstanding the verdict or in the alternative for a

new trial on all issues. Both motions were denied, and both parties have appealed. Defendant concedes and argues here that the verdict is inadequate and that, if plaintiff was entitled to recover at all, he was entitled to a larger verdict. We are inclined to agree. Plaintiff suffered some severe injuries, and his proven special damages amount to at least $2,178.44 as computed by plaintiff. Defendant computes the special damages at a higher figure, somewhat over $4,000.

■ The appeal involves mainly the question whether the evidence before us is sufficient to sustain a recovery in any amount. The action arises by virtue of and is based upon M. S. A. 340.95, which, as far as material here, reads:

"Every * * * person who is injured in person or property * * * by any intoxicated person, or by the intoxication of any person, has a right of action, in his own name, against any person who, by illegally selling * * * intoxicating liquors, caused the intoxication of such person, for all damages, sustained; * * * and all suits for damages under this section shall be by civil action in any court of this state having jurisdiction thereof."

To come within the provisions of this statute, plaintiff pleads the existence of a municipal ordinance in the village of Watson which prohibits the sale of intoxicating liquor to an intoxicated person and a violation of that ordinance by defendant.

The cause of action provided by § 340.95 exists only by virtue of the statute. There was no such cause of action at common law.[2]

It is elementary that, before there can be a recovery here, plaintiff must show that defendant illegally sold intoxicating liquor to Martinson which caused his intoxication and that such intoxication was the proximate cause of plaintiff's injuries.[3]

The only claim of illegal sale here is that defendant sold intoxicating liquor to Martinson when he was intoxicated. Thus, the burden of proof rests on plaintiff to prove such sale.

[2]Hahn v. City of Ortonville, 238 Minn. 428, 57 N. W. (2d) 254; Beck v. Groe, 245 Minn. 28, 70 N. W. (2d) 886; 30 Am. Jur., Intoxicating Liquors, § 612.

[3]Gorse v. Gouze, 141 Minn. 97, 169 N. W. 423.

In determining whether plaintiff has sustained the necessary burden of proof, defendant contends that § 340.14 is the applicable statute in determining whether there has been an illegal sale. As far as here material this statute reads:

"* * * No intoxicating liquor shall be sold or furnished for any purpose to any person * * * *obviously intoxicated* or to any of the persons to whom sale is *prohibited by statute* or by reason of sale to whom a penalty is provided by statute." (Italics supplied.)

Plaintiff, on the other hand, contends that the village ordinance, which simply prohibits sale to an intoxicated person, is controlling. We should also consider § 340-73, which reads in part:

"It shall be unlawful for any person, except a licensed pharmacist to sell, * * * either directly or indirectly, any spirituous, vinous, malt, or fermented liquors in any quantity, for any purpose, whatever, * * * to any intoxicated person, * * *."

Section 340.73 existed prior to the adoption of the prohibition amendment to our Federal Constitution.[4] After the adoption of the prohibition amendment to the Federal Constitution, our legislature enacted L. 1919, c. 455, which suspended all laws inconsistent therewith during the continuation of national prohibition. That act was repealed by L. 1933, c. 130. Laws existing prior to the enactment of c. 455 then again became operative except insofar as they were repealed by L. 1933, c. 115. By Ex. Sess. L. 1933, c. 46, our legislature adopted a rather comprehensive liquor control act in which the language now found in M. S. A. 340.14 first came into existence. There is some contention here that the enactment of Ex. Sess. L. 1933, c. 46, repealed by implication the former law, which is now § 340.73. That the law was not completely repealed by implication is evident from the fact that the legislature has recognized the existence of this section, insofar as the illegal sale to Indians is concerned, by amending the same by L. 1947, c. 87. However, insofar as the two acts are inconsistent, the usual rule prevails that the act later in point of time must control. It follows that, in determining

[4]See, G. S. 1913, § 3148.

whether an illegal sale has been made, the language found in § 340.14 is controlling.

■ Where the legislature has created a right to a cause of action which did not exist at common law and has provided the yardstick by which that right should be measured, recovery may not be had by the application of some standard less than that prescribed by the legislature. While § 340.95 creates a cause of action for the benefit of designated persons injured by an intoxicated person against any person illegally selling intoxicating liquor which caused the intoxication of the person to whom the liquor is sold, this section must be read together with § 340.14, which prohibits the sale of intoxicating liquor to anyone *obviously* intoxicated. The word "obvious" has a definite and well-defined meaning. According to Webster's New International Dictionary (1930) it is defined as "Easily discovered, seen, or understood; readily perceived by the eye or the intellect; plain; evident; * * *."

■ The word "intoxicated" is one of those terms used to depict a physical condition which probably defies precise definition. It may have different meanings when used in different statutes or in connection with different situations.[5] The degree of intoxication varies with the amount of alcohol absorbed in the blood stream, and just when the point of absorption is reached, where it can be said that the person is so intoxicated that it is unlawful to sell him more liquor, cannot be stated with mathematical certainty. The outward manifestation of intoxication varies with individuals as it does with the physical condition of the individual. Even the chemical expert called by plaintiff was willing to admit that, with the amount of alcohol found by the urinalysis of Martinson, some people would not show the effects of it outwardly. As used in these statutes, the definition used by the trial court probably is as good as any. The court instructed the jury as follows:

"* * * When any person from the use of intoxicating liquors has affected his reason or his faculties, or has rendered himself inco-

---

[5]State v. Graham, 176 Minn. 164, 222 N. W. 909; 22 Wd. & Phr. (Perm. ed.) p. 427.

herent of speech, or has caused himself to lose control in any manner to any extent of the actions or motions of his person or body, such person in the contemplation of the law is intoxicated."

In order to invoke the provisions of § 340.95 by showing a violation of a village ordinance, the village ordinance prohibiting the sale of intoxicating liquor to an intoxicated person must be construed in harmony with the legislative intent expressed in § 340.14. Before there can be an illegal sale under § 340.14, the person to whom the sale is made must be intoxicated to such an extent that the seller, using his usual and reasonable powers of observation, sees or should see that the buyer is intoxicated. In other words, there must be such outward manifestation of intoxication that a person using his reasonable powers of observation can see or should see that such person has become intoxicated.[6] In that respect, while the terms may be more or less synonymous, there is a manifest difference between the term "under the influence of intoxicating liquor" (§ 169.12), as used in our traffic laws, and the term "obviously intoxicated," as used in § 340.14. In the former case it may well be that the results of a blood test or urinalysis alone may be sufficient to establish a violation of the law. In the latter case, while a blood test or urinalysis may in a proper case be admitted to assist the trier of fact in determining whether the buyer had reached such a state of intoxication that the seller should have known that he was intoxicated, it does not, standing alone, have the probative force or value which it has in a case involving a violation of our traffic laws. The reason for this distinction is obvious. Where a person has partaken of intoxicating liquor and is driving an automobile, he himself should know what his state of intoxication is. In the case of a violation of § 340.14, the seller must determine from what he observes whether the buyer has reached a point of saturation where it would be illegal to sell him more liquor. It can hardly be supposed that the seller of intoxicating liquor must

[6] Cf. People v. Smith, 94 Cal. App. (2d) Supp. 975, 210 P. (2d) 98; People v. Johnson, 81 Cal. App. (2d) Supp. 973, 185 P. (2d) 105; State ex rel. Gutter v. Hawley (Ohio App.) 44 N. E. (2d) 815.

subject a buyer to a blood test or urinalysis between each drink or sell at his peril if there are no signs of intoxication which should reasonably lead him to conclude that the time has come to refuse to sell more liquor. To give the statute any other meaning would render the word "obviously" in § 340.14 meaningless.

In determining whether there has been a violation of § 340.14 so as to give rise to a cause of action under § 340.95 it should be sufficient if the jury is instructed that, if a sale is made after the seller sees or by the reasonable exercise of his powers of observation should have seen that the buyer has reached such a physical condition as is described above, they may find that there is a violation of the statute. Proof necessarily need not be positive by eyewitnesses. In 2 Wigmore, Evidence (3 ed.) § 235, we find the following statement:

"Intoxication, as a mental condition of temporary stupefaction, may be evidenced circumstantially in the same general modes that are available (*ante,* § 227) for mental capacity or condition in general:

"(1) It may be evidenced by the person's *conduct.*

"(2) It may be evidenced by *predisposing circumstances, i.e.* by the drinking of intoxicative liquor.

"(3) It may be evidenced by his *prior or subsequent condition* of intoxication within such a time that the condition may be supposed to be continuous."

Circumstantial evidence may help to establish the essential fact, but there must be evidence from which it reasonably may be inferred that the essential fact did exist. Cases may arise where an injury occurs so soon after a person leaves the place where intoxicating liquor has been sold to him that proof of intoxication at the time of the injury may be of compelling force, but such evidence becomes of less probative value as more time elapses between the time such person leaves the seller's premises and the time of the accident causing the injury. The only evidence of observable intoxication here is that of the witness Peterson which we have quoted above. All other witnesses who saw him testified that he was not intoxicated

while in the liquor store. It is to be noted that even Peterson would not say that Martinson was intoxicated. After leaving the liquor store there was an interval of about 45 minutes, during which time, according to Martinson's testimony, he drank most of a bottle of brandy at his car. Claiming surprise, plaintiff was permitted to impeach his testimony by showing prior contrary statements, but, even assuming that the jury discarded the testimony of Martinson entirely, the best that can be said is that Martinson was intoxicated at the time of the accident. While the evidence of illegal sale in this case is far from convincing, we think that it is sufficient so that, coupled with a proper instruction to the jury, it presented a fact question.

It seems clear that the jury was confused about the distinction between the proof required here and in an ordinary case involving the unlawful operation of a motor vehicle while under the influence of intoxicating liquor. After retiring, the jury returned for further instructions, when the following transpired:

"The Court: Members of the Jury, does the Court understand that you wish further instructions relative to the meaning of the word, intoxication?

"Jurors: Yes.

\*    \*    \*    \*    \*

"One Juror: Could you explain the term, under the influence?

"The Court: Under the influence of liquor, our Supreme Court in a case defined under the influence of liquor to mean that a person is under the influence of liquor when he has had liquor to such extent that he isn't at himself. Those are the exact words they used, that he isn't at himself. That has been defined to mean under the influence of intoxicating liquors. Now, those are plain simple words, when a person isn't at himself. I think we all know what that means."

The matter was left there without any explanation of the difference in the quantum of proof required under an action of this kind and one brought under our traffic laws, where the term "under the influence of liquor" is most commonly used. Apparently the trial court, as well as the jury, failed to comprehend the distinction between the

two. In view of that fact, the jurors well may have concluded that it would be sufficient to find that the buyer here was under the influence of intoxicating liquor as that term is defined in our traffic laws. Because of that fact, they may have arrived at a verdict on a wrong conception of applicable law, and for that reason we believe that there should be a new trial on all issues so that the case may be submitted to the jury with a definite understanding of the distinction between the two situations.

■ Plaintiff called Martinson as his witness. In answer to the direct question by plaintiff's counsel "Did you drink any liquor after you left the Watson Municipal Liquor Store?" Martinson testified that he drank most of a pint of brandy which he had in his car. Claiming to be surprised by this testimony, plaintiff was permitted to impeach the testimony of Martinson by showing prior inconsistent statements alleged to have been made to patrolman Keilen and to attorneys for plaintiff who took a statement from Martinson prior to the trial. The written statement signed by Martinson failed to show any inquiry concerning that subject. Defendant assigns as error the court's ruling permitting plaintiff to impeach his own witness.

The rules applicable to the right to impeach a party's own witness are adequately stated in former decisions of this court.[7] This question involves a matter left largely to the sound discretion of the trial court.[8]

In view of our decision on the main issue above, we need not determine whether there was an abuse of discretion here. The question is not apt to arise on a new trial, as there can hardly be any claim of surprise if Martinson again testifies as he did before.

Reversed and new trial granted on all issues.

[7]Selover v. Bryant, 54 Minn. 434, 56 N. W. 58, 21 L. R. A. 418; State v. Lemke, 207 Minn. 35, 290 N. W. 307; State v. Saporen, 205 Minn. 358, 285 N. W. 898; Fjellman v. Weller, 213 Minn. 457, 7 N. W. (2d) 521; Witort v. Chicago & N. W. Ry. Co. 170 Minn. 482, 212 N. W. 944; see, also, Young v. United States (5 Cir.) 97 F. (2d) 200, 117 A. L. R. 316; 3 Wigmore, Evidence (3 ed.) § 904, note 3.

[8]Fjellman v. Weller, 213 Minn. 457, 7 N. W. (2d) 521.