Peggy J. LARSON, individually, and as mother and natural guardian of Stephanie Blake, Appellant,

v.

MOORHEAD COUNTRY CLUB, Respondent.

No. C5–86–511.

Court of Appeals of Minnesota.

Nov. 4, 1986.

Review Denied Dec. 23, 1986.

Steven J. Cahill, Cahill, Jeffries & Maring, P.A., Moorhead, for appellant.

R.B. McLarnan, Gjevre, McLarnan, Hannaher, Vaa, Skatvold & McLarnan, Moorhead, for respondent.

Heard, considered and decided by NIERENGARTEN, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

NIERENGARTEN, Judge.

The survivors of David Larson sued the Moorhead Country Club (Club) under the Minnesota Civil Damage Act, Minn.Stat. § 340.95 (1984), claiming that the Club served liquor to David Larson after he was obviously intoxicated and that this illegal sale was a direct cause of the single car accident that took his life. The jury found there was no illegal sale and found zero damages. Larson moved for a new trial contending the verdict was not justified by the evidence, that evidence was improperly

admitted and disallowed, and improper jury instructions were given. The motion was denied and this appeal followed. We reverse and remand for new trial.

## FACTS

On September 6, 1984, David Larson arrived at the Moorhead Country Club (Club) at about 1:30 p.m. to play golf. He had at least one drink at the 19th Hole Lounge. His golf match began at 2:16 p.m. During the first nine holes he was served a drink from a golf cart which the Club circulates around the golf course serving intoxicating beverages and soda pop. Between the ninth and tenth holes Larson and his companions stopped for a drink at the 19th Hole Lounge. On the back nine he had a drink from the circulating golf cart and may have purchased a drink at the portable bar maintained by the Club between the twelfth and thirteenth holes.

At the end of the golf match, around 6:30 p.m., Larson and his companion had another drink at the 19th Hole Lounge. Larson then left and went to the Sunset Lane bowling facility because he mistakenly thought he was scheduled to bowl that evening. After discovering his error he returned to the Club about 7:00 p.m. He went to the 19th Hole Lounge and had between three and five drinks. He and his friends then went to the upper level of the clubhouse where they were served an unknown number of drinks in the lounge. Larson had dinner about 8:30 p.m. and had at least one drink with dinner. Between 9:00 p.m. and 11:00 p.m. he had at least three additional drinks. His last drink was rung up on his tab at 10:18. The waitress who served the last drink testified she observed no signs of intoxication in anyone at the table. However, between 10:20 and 10:30, a second waitress told the first waitress that the whole table at which Larson was seated had had too much to drink. At this time (10:20 to 10:30) the second waitress testified that Larson's speech was slurred and he was becoming loud and obnoxious.

After the last drink, Larson left the Club and drove to Ed's Standard Station. He was observed there by a Moorhead police officer. Larson told the police officer he intended to drive to Perley, about twenty miles away. The officer warned him not to drive or he would be arrested. The officer left to answer an emergency call and Larson got in his car and drove off. Larson was about seven miles out of the city when his car left the road on a curve, rolled over and he was killed.

It was stipulated that Larson's blood alcohol content was between .275 and .29 percent. In the opinion of the only expert witness to testify, even an experienced drinker like Larson would have shown signs of intoxication by 9:00 p.m. and definitely by 10:00 p.m.

## ISSUE

Was the jury verdict finding that defendant did not make an illegal sale contrary to the evidence?

## ANALYSIS

Larson claims that the jury verdict is so contrary to the evidence that a new trial must be granted. In reviewing a verdict on appeal, "the evidence must be considered in the light most favorable to the prevailing party and the verdict sustained if it is possible to do so on any reasonable theory of evidence." *Ruskamp v. Ferknes*, 261 N.W.2d 612, 613 (Minn.1978). The verdict must be upheld "unless it is manifestly and palpably contrary to the evidence." *Cobb v. Aetna Life Insurance Co.*, 274 N.W.2d 911, 917 (Minn.1979) (citation omitted).

Minn.Stat. § 340.14, subd. 1a (1984) provides that:

> No intoxicating liquor shall be sold, furnished, or delivered for any purpose to any minor or to *any person obviously intoxicated* * * *. (emphasis added)

The issue at trial was whether or not the Club served Larson liquor when he was obviously intoxicated. The jury found that it had not.

The evidence on the record appears so contrary to the jury verdict that we cannot let it stand. Larson was at the Club from 1:30 p.m. until about 10:30 p.m. (with the exception of about one-half to one hour at the bowling alley). During that time there is uncontradicted evidence that he drank voluminously and continuously. The sole expert witness concluded that based on Larson's blood alcohol content he probably showed signs of intoxication by 9:00 p.m. and was without a doubt obviously intoxicated by 10:00 p.m. Both drinking companions and another patron testified that in the period from 8:00 p.m. to 9:30 p.m. Larson's speech was slurred and he was exhibiting some obnoxious behavior (he was loud, spilled a drink and was unsteady on his feet).

The only evidence on the record on which the jury could try to justify its verdict was the testimony of waitress Teri Logelin, who served the last drinks to Larson's table about 10:18 and said she did not observe that anyone at the table was intoxicated. This single piece of evidence is directly contradicted by another waitress, Christine Hall, who between 10:20 and 10:30, when asked by the Larson table to take an order, declined to do so because most of the people, including Larson, appeared to her to be obviously intoxicated. It stretches the imagination beyond reasonable limits to find Larson not obviously intoxicated at 10:18 and yet visibly intoxicated at 10:20.

The Club relies on *Seeley v. Sobczak*, 281 N.W.2d 368 (Minn.1979) which involves a drinking bout similar to this case. In *Seeley* the evidence showed decedent had a high blood alcohol content, had been drinking for about six hours, that he and his friends became intoxicated frequently at the defendant bar and were still served, and decedent sounded intoxicated. On appeal, the supreme court held that decedent's blood alcohol level alone could not establish, as a matter of law, that decedent was obviously intoxicated. The court said the verdict was supported by the evidence even though the expert testified that anyone with over .2 percent blood alcohol content would be visibly intoxicated. The

court said the jury need not have found the expert testimony conclusive. *Id.* at 371. However, the nature of the *Seeley* finding of intoxication is somewhat different. The only evidence to support Seeley's intoxication, other than expert testimony, was evidence that his wife and daughter received a phone call from decedent and he sounded drunk when he spoke.

Five other witnesses testified that they had observed Seeley and he did not appear to be intoxicated. Two of those witnesses were disinterested patrons of the bar. In this case the only two eyewitnesses called by the Club were employees, one testified Larson was not obviously intoxicated around 10:18 p.m. but the second admitted that two minutes later all the men at the table were visibly intoxicated. The remaining testimony, both by friends, a disinterested patron and an expert, was that Larson was obviously intoxicated when served with additional liquor. There were several witnesses, both friends and another patron, who testified that Larson was visibly intoxicated as early as 8:00 p.m. and was still served additional drinks.

The jury was given the standard jury instruction:

> A person is "obviously intoxicated" if that person's intoxication is *or should be reasonably evident or apparent* to another person using usual powers of observation.

(emphasis added).

The Club accepted this jury instruction as correctly stating the law. Larson's intoxication should have been reasonably evident or apparent to the Club employee at the time she served Larson his last drink. It is with reluctance, and after careful consideration, that we reject a jury verdict which was allowed to stand by an experienced and competent trial judge.

We recognize that a finding of zero damages, even if contrary to the evidence, may not require a new trial where the findings of no liability are supported by the evidence. *Otterness v. Horsley*, 263 N.W.2d 403, 405 (Minn.1978). However, in

view of our finding of liability on the part of the Club, the jury's finding of zero damages does become prejudicial. Here the evidence was sufficient to support a damage claim under Minn.Stat. § 340.95 and a jury is required to reflect those damages in its verdict. As succinctly stated by the Minnesota Supreme Court, "it is difficult to visualize a case where a human being does not have some monetary value * * *." *Pehrson v. Kistner*, 301 Minn. 299, 303, 222 N.W.2d 334, 337 (1974).

### DECISION

A Club employee continued to serve liquor to David Larson after his intoxication should have been reasonably evident or apparent to that employee using usual powers of observation.

Reversed and remanded for a new trial on the issue of damages alone.